Good afternoon. We're here for the embankment argument in the United States v. Preston. We have Judges Gould and Wardlaw appear by video. Judge Gould, are you able to hear us? Yes, I can hear you. Thank you. And Judge Wardlaw? Yes, I can hear you very well. Thank you. Okay. And Judge Newman by telephone? Yes, I can hear you. Thank you. Okay. So there we go. Our counsel ready? Okay. We'll hear from the appellant. Good afternoon, Your Honors. May it please the Court. My name is Keith Swisher, and I represent Tymond Preston in this direct appeal. I very much appreciate the Court taking the case, this important appeal, en banc, and it's an honor to be here before you today. I would like, if possible, to reserve five minutes of my time for rebuttal, and I'll try to mark my clock toward that end. This is a troubling appeal because Mr. Preston, my 18-year-old mentally impaired client, didn't do it. Or if he did do it, he didn't do what he said he did, because what he said he did was both false and involuntary. And he also didn't, in terms of the victim's statement, it wasn't what the victim said he did, because that statement was mostly imaginary, and in Judge Newman's striking words, in this farrago of fantasy, no fact reveals itself as worthy of belief. I would like to... What do you mean by saying it was false or involuntary? What he did was involuntary or false? I just said a confession being involuntary, but what do you mean by what he did was involuntary? Oh, I'm sorry, I'm referring to the involuntary confession. This case involves the coerced confession of a mentally impaired youth. And I'd like to focus my remarks on my first and last issues in the brief, namely that this was a coerced involuntary confession, and the last issue on the problematic supervised release conditions, including the phenolphysmograph testing that was ordered on my client. I'm, of course, also here for your questions on any issue, in addition to Issues 1 and 5. One of the reasons why I became aware of the case and took the case is because of the issue with the false confession. And it's kind of like a dinosaur, almost, in this case. I'm familiar with Innocent's work, and oftentimes you'll come to the false confession later on, years down the road, and you'll see sort of fossils of it, if you will. There might not have been a recording in the case. Years later, new evidence is dug up, et cetera. But I feel like we're actually looking at a dinosaur on direct appeal in time to do something about it. And I know this is a little less traditional, but it just came out yesterday. I'm not sure if you subscribe to The New Yorker, at least maybe for the cartoons, but there was a fantastic article on what's been happening across the country in false conviction work. And some of the science that I cited is mentioned in it. It's only eight pages, but it's incredibly timely and incredibly powerful for context. It's Douglas Starr, the interview, Do Police Interrogations Produce False Confessions? It's a December 9th issue of The New Yorker. So why was Mr. Preston's confession involuntary? What is the nugget? What makes it involuntary? Okay, well, Judge Pye, it's involuntary because of the coercive techniques, which get us over to the threshold of also looking at on this vulnerable 18-year-old mentally impaired defendant. Those techniques are the read techniques discussed in that article, but also as both investigators, both agents admitted they were trained in read somewhat cryptically. They didn't necessarily use the read techniques as trained. For instance, in the confession that you see in the record, it's dated October 30th. That was 29 days after they were actually talking to Mr. Preston. Yet Mr. Preston didn't change a single thing, including that date. But also, Judge Pye, all of the- Wait, I don't follow that. You're saying that because the date is incorrect? It's a habit of confession. Okay. Oh, yeah, I'm going to talk about the other dates. But what about the techniques, getting back to Judge Preston? Oh, certainly, yes. So they set the stage, Judge Kristen, for what they wanted to hear. So they said, we're here to talk to you about a molestation, and they said 16 times over the course of that interrogation that it happened on a Friday and then eventually a Thursday. So that's what they wanted to get from Mr. Preston. Then they promised immediacy and an in-street twist confidentiality, too. They said, we're not going to tell anybody about it. We don't talk to anyone. It goes with us. It stays in the folder. It's in the attorney's office, and that's it. There's no indication that the office has intentionally goofed up the date, is there, the day of the week? There's no indication that that was a tactic, is there? No, there's not, Your Honor. Okay. So does that matter? No, I would suggest it doesn't. Okay, but we're talking about whether there was coercion. Is your point that it was inherently confusing or- It was confusing to Mr. Preston because people of his function often rely on routines. He had a very clear routine on a Friday, right? Otherwise, he didn't have a lot of time landmarks, it sounds like. But on a Friday, he would always go to see his cousin. They would go to the flea market, and he would stay the night. So he did know that he wasn't there on Friday. When they kept compelling him to answer what he did on Friday, he eventually got the signal, as I would submit you would see in both the written transcript and the audio recording of the interrogation. He eventually got the signal, I need to say something, right? Otherwise, it's going to work out a lot worse for me. Did he ever admit that he was there on Friday? Yes, I would say so. In response to the agent's questions, because the whole context, as I mentioned 16 times, the focal point was a Friday, and he eventually admitted to doing something that they were looking for on the Friday. So he didn't use the word Friday, if that's what you're looking for, Your Honors. But in the context of the discussion, he was admitting to something that happened on a Friday. I don't think he did admit to being there on Friday, which is, I think you're, I'm not trying to argue with you. It's just I want to be clear about what your argument is, because you're right, I counted there 16 times, where they insisted that they knew he was there on Friday, that up to eight people would say that he was there on Friday. But under the rubric of whether or not this was coercive, it seems to me that your argument really has to be that he, that it was confusing. If I'm missing that, tell me, please. Yes, absolutely. He got the signal from the officers that he needed to admit it, even though he knew he wasn't there on the Friday. Also, you mentioned the evidence. That is part of the, this is totality of the circumstances, that's part of the coercion, and that's mentioned in the case law that you could consider whether or not they lie. I'm not saying independently whether or not they lie about the evidence, but they did say forensic proof something happened. That would have been Friday six days ago. Do you remember Troy being over here? No, all I know just a bunch of little kids over here, which seems to be completely responsive to Friday. That's what he was talking about was Friday. Well, yes, Judge Barzon, I think I follow in that. I mean, as I understand it, your argument about the use of Friday isn't that it was coercive, it's that it was evidence of his susceptibility or suggestibility because in that dialogue he seems at that point to have finally agreed that this was all happening on Friday. Yes, absolutely. And the techniques of which we're talking about and his characteristics in this context, his will was overboard. But that wasn't a technique. That was a mistake. It was just evidence. But they did say you have to tell us what happened on Friday. Yes, absolutely. Right, you have to admit to X, and X, of course, didn't happen on the 7th of Friday. They also said that, well, Judge, the district court agreed that, you know, in this context admitting guilt gave Mr. Preston the impression that it would reduce the consequences, and that's at ER 42 through 43. Also, the agents themselves reluctantly admitted that they created this atmosphere in which if Mr. Preston told them what they wanted to hear, the consequences would be reduced, and that's at CLDR 21 through 25. Counsel, can I ask you to articulate, distill down the legal rule you want us to announce in this case? Because let me just tell you my hesitation in ruling in your client's favor. Basically, everything except the nature of the questions, I guess, that were given to your client, point away from a finding of coercion here, right? He's not detained. He's at his home in a comfortable environment. The police officers aren't even, you know, dressed in uniform with arms on them that are visible. The interrogation is a relatively brief one. It's not days and days. So I'm focusing on the nature of the questions that were put, but I'm having a hard time distilling a legal principle that we would announce that would govern and allow your client to prevail. Sure. Well, Judge Walker, it is the totality of the circumstances test. I mean, so, of course, I'm not saying that you should never consider the length of interrogation. That could be relevant. I'm not saying you should never consider where it took place, but the considerations for you to consider, which is backed up by the cases, is that there were two agents. They were promising leniency and confidentiality. They were also lying about the evidence. They were threatening. So if you fail to cooperate or if you're lying, we're going to tell the prosecutor, and we'll be back again and again, too, if we don't get what we want. So I'm not asking you to rule out the other factors. I'm just saying in the context of this case with these promises, some of which also not only violated due process, but I would submit also violated his Fifth Amendment right not to self-incriminate himself in the cases of Harrison and Tingle. None of this would be enough but for the claim that he is mentally impaired, right? I don't know what you call it. Low IQ? Yes, in fact, he does achieve that. If this were somebody his age and experience and every other factor were the same, you wouldn't really have a case at all, right? I mean, you have a case, you know, the district court determined it against you and you wouldn't have a case in appeal about it. Chief Judge Kaczynski, I actually do still think we would have a case because some of the things that were promised to Mr. Preston, I don't think should be permissible in any case in Harrison and Tingle, touch on those, including we don't tell anybody about this. We've held that police can lie. They do not have to tell the truth. They don't have to, you know. I mean, one may like or not like that rule but that is the rule and it's hard to draw a line saying some lies are okay and other lies are not okay. Lies, not lies. I don't know where you draw the line with that. Sure, absolutely, Chief Judge Kaczynski. Lying is a good example. In isolation, plenty of cases stacked fairly high that say that in isolation that's not enough to overbear someone's will, right? But you also have these other promises of leniency and confidentiality and also the cases say that it's not about one factor in isolation, it's sort of their cumulative effect. Well, I can understand. I mean, if you're lying and saying, hey, if you don't tell me this, we're going to kill your cat, you know, that's a lie and that's a different kind of lie than saying if you tell us the truth, we're going to keep it confidential. You know, if you don't tell us something, I'm going to kill your cat, you know, you could very well say whatever they want to keep them from killing your cat. But if you say you tell us the truth and we will keep it confidential, that's not the kind of lie that's likely to come up with something false. That's likely to come up with something truthful. So it's a very different kind of... I agree. Your example seems more extreme to me and certainly more explicit. But once they promised him confidentiality, that we're not going to tell anybody about this, and also think of it on the flip side, otherwise we're going to have to tell everyone about this. That's when he finally sort of got the hint and said, okay, the boy was over here, right? And then Agent Secretary jumped in and said, well, we also know that something happened inside. And that's kind of how the ball started rolling. Also, he rejected their attempts by saying no, I don't know, etc., So in addition to Judge Kaczynski, I would also mention that we're not, of course, the next sort of answer to your question is we're not dealing with, say, a 31-year-old educated business person who has experience with the criminal justice system. And the number of those cases, how does it feed in that you were dealing with a defendant with a 65 IQ? How does that feed into the analysis? And in particular, does the fact of suggestibility or the fact that there were these binary questions being asked, which again would ordinarily be coercive, but does that become part of the analysis when they say, did you do A or B? And they say, well, he could have just said, I did neither of them. Yet we have some articles and so on that say that that's not how manly work target people think. How does that feed into the legal analysis? Oh, sure. Thank you, Judge. A couple of points on that. First of all, when agents create this circumstance, they're trying to paint a limited picture for an individual. Even one of us would start to view limited options as to, for instance, are you, just to be blunt from the record, did you stick your penis in all the way or just a little bit? Are you a one-time experimenter for which there might be help? Or are you a serial molester for which we don't show any sympathy to? Also, as Dr. DeBacco testified, and I might pause just for a second there, Dr. DeBacco was the only expert, the defense expert, among other things that, in light of Mr. Preston's level of functioning, having two people shoot questions at you is even more confusing for him to process. But that's why I'm trying to understand how, at what point in the legal analysis do those considerations feed in? The fact that he is more likely to be, if it's true and if there was some evidence in the record, susceptible to these binary questions and to officers and so on. I mean, case law seems to say that first you have to get over a coerciveness hump. But as Chief Judge Kaczynski says, it doesn't seem that anything that happened here would be enough necessarily if this person was not retarded. So how do you put those two pieces together? Two items, Judge Berzon. First of all, I would say there is enough on this record. Because you say the promise of confidentiality, I think, is... Are you not talking about for any individual, or are you trying to answer Judge Berzon's question about given that this person is cognitively impaired? Yeah, okay. Good point, Judge Kaczynski. Let me flip it. If we show that there were coercive techniques used, which is the types of techniques we've been talking about, then you consider the characteristics of the defendant. But are the techniques such as the binary questions and the two officers, are those coercive techniques that would, or are those only come in later in the analysis with regard to the fact that this person is cognitively impaired? I would suggest they're coercive in a general sense. But I would say in isolation, that's all we have. That wouldn't be enough to identify... Why did we disagree with you on that? That's the part that I think your question... I think the questions are trying to get you to that point. And if they haven't been, mine is. I want you to assume, for the sake of this question, that all the techniques that were used would not equate to an involuntary or coerced confession for your hypothetical 31-year-old intelligent business person. It's okay to have two people there. It's okay to ask binary questions. It's okay to say it will go easier for you. I want you to assume that for the sake of this question. Does the fact that your client was 18 and had an IQ of 65, does that transform what would otherwise be a permissible confession into an involuntary or coerced confession? And if so, why? Yes, Judge Gaber, it does. The reason is the techniques in their totality are enough to meet the threshold to consider the defendant's characteristics. And once we consider the defendant's characteristics, as the government didn't put up as much fight in its brief about the government's characteristics or on appeal. He had an IQ of 65. He has gross deficiencies in cognition and language comprehension. Your answer suggests that there may be a problem if we don't find any of the techniques problematic. So I want to give you another hypothetical and see if I can sort of understand your position. Let's assume that everyone would agree that none of the techniques was coercive or inappropriate in any way, that people brought in. There was one person and they said, gee, what happened? And then he talked. But you have evidence that he was so eager to please or so retarded or whatever phrase is appropriate to use that he would say whatever he thought the person wanted to hear. Is that an involuntary or coerced confession? In other words, can the person's impairment override the need to first find the improper techniques? Judge Graber, I believe the answer to that question under all of those assumptions is no. Why not? Why do you say no? Well, because... I thought you would say yes. I would like to say yes, Judge Pius, but I... That's where I understood your argument. No, it's a coupling. There's coercive techniques, maybe not such that would overbear one of our will, but enough to overbear Mr. Preston's will. But I'd also say in isolation, too. And then once you have those in presence, which you do have in existence in this case, then you can consider the characteristics of the defendant. Counsel, the Connolly court said that coercive police activity is a necessary predicate to finding that a confession is not voluntary. You've acknowledged that as much. It also said that mental condition is surely relevant to an individual's susceptibility to police coercion. So I join Judge Pius. I don't understand how you can answer no to that question. Well, we were assuming when... I thought I was told to assume that there weren't any coercive techniques. But I do agree that it should be filtered as to who they're being applied onto. I don't think the question... the supposition is that there were no coercive techniques. If I understood Judge Laver's premises, assume that the techniques, such as they were, would not be enough to be deemed coercive as to a... median IQ. I think that was the question. I see. Well, I actually asked both. That's what I was trying to back into, whether you were trying to argue the proposition that even if the techniques were all proper and not coercive, you'd still win. That's what I was concerned about in your earlier argument. Okay. I do want to agree that the techniques in the totality searches would look at the characteristics of the defendant. I don't want to imply that... So how do you deal with the district court's treatment of that issue? Because the district court goes on to say, well, look, I considered Dr. DeBacco's testimony, and I don't see anything here that would indicate that there was a problem in this instance. What's wrong with that? Well, one, Judge Thomas, I don't think that it coheres with what Dr. DeBacco testified to. It testified to Mr. Preston's and those in his shoes' vulnerabilities to these types of techniques that likely led to inaccurate answers, and then also the point that I was mentioning earlier about he would be even more confused if you have two agents sort of... All right. So you're just saying the district court committed a clear error of fact? Is that where we have to get... I mean, the difficulty is, if you start with the notion, which I think is generally true, that considered in isolation, these techniques have not been deemed to be coerced. You may disagree with that, but I think it's generally true, because we've allowed a fair amount of latitude on psychological coercion. So if it's to take it out of that phrase where we say that, as an ordinary person, it wouldn't be coercive to him it was, how do we get there on this record, and given the district court's finding? Because the district court said no. I mean, I accept the testimony, but I don't think he was susceptible. Well, two points. I don't think, on the legal arguments, I don't think the district court believed that these techniques, and it's not just in isolation, it's cumulative, were coercive such that we can also consider the defendant's mental impairments, too. And then there really isn't anything in the record to the contrary of which I'm aware. Also... Now that nor was there any convincing explanation of how a difficulty in understanding the agent's factually suggestive questions would have resulted in his will being overcome to the extent that he would adopt the factual suggestions. That's what the district court says. So you tell me how we get around that. Well, first of all, Judge Thomas, on the facts as found by the district court, the legal conclusion is that it would overbear his will in the totality of the circumstances. So I'm not necessarily asking you to challenge a specific fact finding by the district court. How is that a legal conclusion? I guess the question is, is this a fact finding by the district court as to the involuntariness of the... No, Judge Rosano, I don't believe it is. I think it's a legal conclusion that in all of the circumstances as found, as noted by Judge Thomas and the record, that in light of those circumstances, it's not involuntary. But isn't this an individualized question that is ultimately turns on the subjective question of whether his will was in fact overborne? I'm sorry, can you repeat the question one more time? Isn't this ultimately, once you get over the course of techniques and filter in his status and characteristics, a subjective fact, a state of mind fact as to whether this person's will was overboard?  I think it's, well, I suppose it perhaps could be mixed in that sense. I would, I guess I would have to answer that it was overborne on the state of the record. There was some briefing on whether it was a subjective or objective. It might well be a more objective test, but again, in light of your premise, you do consider the characteristics of the defendant. Can I ask you this? Sure, Judge Rosano. Isn't the district court in a vastly superior position than we are to make that assessment, the assessment that Federer's on his frame? Because the district court judge at least was in a position to observe your client, interact with him at least in several different contexts. We're going on, we have the tape of the interview, but in terms of the judge's ability to assess the defendant's individual characteristics, isn't the district court in a much better position than we are to make that assessment? Well, Your Honor, Judge Wofford, I would suggest not much because we have the audio recording in this case, and to its credit, that's why we can identify some of these coercive techniques. A lot of times we don't have the audio recording. We also have my issue, too, where you see in the jury trial waiver that the defendant had trouble answering the questions. It was basically yes, yes, yes, and then when Judge Snow would flip it to where he really needs a no answer, he was still getting a yes answer from Mr. Preston because that's what he thought he wanted to hear. Even sort of a coincidental tie-in, but I think it's highly of Mr. Preston's ability to answer questions including ranges, when we're talking about whether you can waive a jury trial, Judge Snow asked, well, how many jurors do you need to agree that you're guilty? And he said maybe five, six, right? That's also the same response he gave to when the agents were asking for a range as to how long did you put your penis in the alleged victim, and he said, as well, five, six seconds. So the point is, Judge Wofford, is that on this record you can see the demonstrated deficiencies and the demonstrated confusion in these environments, and so I don't think that I'm asking you to stretch. Do you don't think any differences of whatsoever to the district judge's own assessment of whether, in fact, your client's will was overborne here? Well, it's then about determination, so I suppose my answer would be no. I think it might be different if Mr. Preston had testified at any of the proceedings or, you know, as to the agent's statements and what he was thinking. Is there a case law on that narrow question as to whether the involuntary in this ultimate conclusion is a factual determination which is reviewed for clear error? Is there any case law on that question? For clear error? Well, if I were to ask you to challenge some of the district court's factual findings, but otherwise, I believe the case law is that it's a den of a review of whether or not this was involuntary in the circumstances. And what case is that? Well, the panel opinion cited a case called Gomez for the proposition that the underlying factual findings are reviewed for clear error, but the ultimate conclusion is reviewed de novo. And I'm referring to that case, but it's also cited like that in a number of other cases, but I can also- You've got two minutes. Oh, sure. Thank you. And with respect to his characteristics, I'm also not asking you to stretch very far. Do you want to say a little rebuttal? Yes, if I just might use one second just on the characteristics. Because the agents knew that he was young. They had a certificate of Indian blood. They knew he was only 18 years old. But he did not understand the word disabled, then admitted that he was disabled. He said, I am not all there. Sometimes I go crazy. Their own report said that he dropped out of 10th grade. So I would submit the sum of all this, in light of the coercive techniques on this defendant, means that it was an involuntary confession such that it did, in fact, overcame Mr. Preston's will. And, yes, I would reserve the rest of my time for rebuttal. Thank you. Thank you. We'll give it to the government. May it please the Court. My name is Mark McKenovich. I'm from the District of Arizona. I represent the government in this matter. This is not the case of a molestation charge that was reported days, weeks, or months after the molestation occurred. This was a contemporaneous accusation. The defendant himself, when asked the open-ended question, after he had admitted that the molestation occurred for five or six seconds, was asked the open-ended question, and what happened then? To which the defendant replied, nothing. Just walked out, like he got out the door. He just started laughing. Then he said, I'm going to tell on you. And then he just f-ing started crying. Made a big old deal like. And how do we know that's true? Because that's exactly what the victim did. The victim went the 50 feet to his own home crying. With tears in his eyes, he told his grandmother that his butt hurt. There was a fair amount of back and forth about whether he actually did tell her right away, or whether it was reported right away. It was Friday afternoon, it was at 630, it was at 730. Why didn't they call later, or faster, and so on? Your Honor, I disagree. Reviewing under the Jackson v. Virginia standard, the facts in a light most favorable to the verdict is clear that this was contemporaneous. It's clear from the defendant's own confession, the victim's accusation, the victim's contemporaneous excited utterances that came in from two separate witnesses, both his grandmother. The district court found this? The district court found that the confession was strongly corroborated. No, no, no. You said it's a fact that it's contemporaneous, and I'm just wondering. It's a fact viewed under the Jackson v. Virginia standard. The district court found this. Do you understand the question? Yes, I do, Your Honor. So don't answer another question. Just answer that question. I apologize, Your Honor. The district judge, I believe, did find that it was contemporaneous. When I say I believe, it means they don't know. So why don't we give you sort of three possible answers, yes, no, I don't know. Yes, Your Honor. Okay. Tell me where. Okay. In the – well, first of all, the district court found that it was an excited utterance. No, no. Tell me where. Okay. Before you change the subject, just tell me where. Give me an answer. Yes, Your Honor. With all due respect, I wasn't changing the subject. You're answering the question about hearsay, not the question about where to find it, and the record about the finding. In order for him to find that it was an excited utterance, one of the – I asked a why question. I asked a where question. If you want to answer a why question, that's changing the subject. So, in fact, we're changing the question. So why don't you answer the question I did ask, where. Okay. So, in the findings made by the court at the end of the trial. Okay. Page, paragraph, line. Okay. So, this would be 190 of the excerpts of records. Now, which page of the order? Paragraph – which paragraph of the findings? 20. Okay. Line 11 through 15. What does it say, contemporaneous? Your Honor, you're correct. It doesn't say contemporaneous, but I submit – Okay. Let me ask the question one more time. Did the district court find that this was contemporaneous? No, Your Honor. Okay. So, if the answer is no, then you can't argue this finding is supported by evidence. Then we have to look at the evidence and see whether, in fact, that's what happened. See, it's one thing to say, look, district court found contemporaneousness, and here is why it's supported by the record. It's quite a different matter to treat evidence of contemporaneousness as tantamount to a finding which can't be disputed on appeal. You do understand the difference, don't you? Yes, Your Honor. And I'm not saying that it can't be disputed. I'm just saying that under the Jackson v. Virginia standard, taking all of the evidence in the light most favorable to the verdict, it supports that it was contemporaneous. The defendant's confession – So what's the verdict? The verdict? Yeah. The guilty verdict in this case. Oh, but we're talking about the confession, right? We're talking about the district court's findings here. But the Jackson – This is not a question of the verdict. This is a question of whether or not the district court's findings are supported. Your Honor, I think that the defense has done a good job of conflating veracity with voluntariness. Yeah, you've got me totally. As I understand it, there was a pretrial motion to exclude his confession, correct? Yes, that's correct. And the district court denied that in a reasoned decision, right? Yes, that's correct. Then the case went to trial. Yes, that's correct. And they put on – it went to bench trial. Correct. They put on some evidence. They didn't call the victim to the stand. They admitted his statements, if I remember correctly. They admitted his statements, but they also – They didn't call – he didn't testify. That's correct. His grandmother and – Okay. And then at the end of the trial, the judge made his findings on the evidentiary record that was put forward on whether or not he was guilty, the defendant was guilty of the charges. Okay? Right? Your Honor, he also bolstered his findings on voluntariness in those findings as well. If you read both of those, he supplements his findings on voluntariness at the end of the trial as well. So he thanked him guilty, but he further finds that there was further evidence to support the voluntariness, including the evidence that was submitted in Dr. Cady's report, which is far from the mind of a five-year-old comment that shows up in the dissent with all respect to Judge Noonan. That statement, the mind of the five-year-old, comes not from the defendant's experts, but that comes from the victim or the defendant's mother. We do have medical evidence that he had a 65 IQ, and we have a lot of case law saying that, as well as medical knowledge, that that is a person in something like the 1% of intelligence, something like that. Very low percentage, I believe it's less than 1% based on Dr. Cady's statements, but Dr. Cady also says that he doesn't even suffer from a learning disability. Dr. Cady also says that he's read an entire Tony Hillerman novel that I checked last night has 27 chapters. Furthermore, this defendant was never, his will was never overborne, and that's something that the district court did find. What do we do with the fact that it seems uncontested that he had an IQ of 65 counsel? Does that play no role in this analysis? Your Honor, it does, but the district court... So I'm asking where does it, what do we do with that, please? Well, there's Colorado v. Connolly that the court is well aware of, and the district court was very clear that there were no coercive practices used in this case. Wait a minute. Go ahead, finish. So it's your view that the fact that he had a 65 IQ doesn't factor into the analysis of whether or not any of these techniques were coercive? What's coercive for one is coercive for all. What's not coercive for one is not coercive for all. Is that your view? Your Honor, that is not my view. What is your view, counsel? What do we do with the 65 IQ? Well, I think the district court wasn't relying on Colorado v. Connolly in its findings. The district court was looking at the totality of the circumstances to determine whether or not his will was overborne. Counsel, I don't think you're answering my question. Sorry, Your Honor. That's okay, but I just, your time is ticking, and I want to make sure you have an opportunity to answer it. And my question is, how would we factor in that this individual had an IQ of 65? How does that factor into the analysis? Your Honor, a totality of the circumstances test takes into account all of the circumstances, including his low IQ. And the district court expressly did that twice. So when we look at the dichotomy of the different choices that were given to him in this interview, when they said, for example, there are two kinds of people. There are serial molesters, and then there are people who molest children, but on a one-off basis, I'm summarizing, as you know. When we look at that, do we consider whether that is coercive to a person with an IQ of 65 differently than we would the 31-year-old that Judge Graver gave you in her hypothetical? Well, Your Honor, I think you can look specifically at this individual and look at the totality of his interview and see that his will wasn't overborne. He continued, even up to the signing of the written statement, not to have his will overborne. He was answering only those questions that he wanted to answer in the way that he wanted to answer them. So I don't know the answer to my question. I still haven't heard your answer. So the answer is, in this particular case, his IQ being 65 is not contested. Whether or not he has the mind of a 5-year-old is contested. So I'm going to just try my question one more time. And the last time I'm going to ask it is now. And that is, when I look to determine whether or not I think these questions were unfairly coercive, do I consider that they were asking someone with an IQ of 65? Your Honor? Isn't your answer yes? Well, you stated that it's a totality of the circumstances. It's a totality of the circumstances. But one of the concerns that's motivating Colorado v. Conley is that we want to discourage police from taking actions that we don't think are fair. There was basically no interrogation. The guy walked up and said, I want to confess. And they said, what happened? And they told him. That was all of it. So there was nothing to be coerced. But there are a lot of cases that aren't like that either that have relied on Colorado v. Conley from this circuit, including Derrick, including, I don't know if Conrad relied on Colorado v. Conley expressly, but I know Conrad relied on Derrick. There are a number of other cases like that where people with no IQ have been questioned. Counselor? Counselor? Hi. Hi. Sorry. Don't you think some of those cases actually over-read Professor v. Caroline? I mean, to me, I don't think that language in that case. Yes. We do have some nondiscriminate cases that say you have to sign coercive liaison papers before you can get into the rest of the analysis. But I don't see that in Conrad itself. Well, Colorado v. Conley, I believe you're referring to, Your Honor. I'm sorry. No, that's okay. That's okay. So in Colorado v. Conley, I believe the motivating principle of that case, I shouldn't use the word I believe. I've been counseled on that one. Don't talk about motivation. Talk about the case. So Colorado v. Conley said that the coercive police conduct has to be connected to the confession, and that's not what we have in this case. This report made an express factual finding that the defendant never admitted to doing it on a Friday. That is an express factual finding. It is not clearly erroneous. That's not true. It is true. That, I can give you a second. Before, the sentence where they said, on this Friday, you have to tell us did these guys come, and he says the guys came. He didn't say I did it. They came on Friday, but it was directly responsive to a question about Friday. Your Honor, the quote that you read on page 17 of the transcript, it's S.E.R. 34. Preston's answer, the investigator asks Friday, and then the agent asks six days ago, do you remember Troy being over here? Preston says, no. All I know is it's like there's a bunch of little kids over here, plus that other guy. But I don't know, but I don't know what happened that day. But I wasn't on drugs, under the influence, or nothing. That is not an admission that anything happened on Friday, Your Honor. And that's what the district court expressly found. That despite the fact that this person was asked 16 times as an accident, certainly not as a tactic, 16 times this person refused to admit having been home on Friday because he wasn't home on Friday. But what did he admit to? Inserting his penis a little bit for a short period of time into the victim. That the defendant didn't think it's a big deal maybe goes to the fact that he has an IQ of 65. But it doesn't go to the fact of whether or not his confession is admissible. The questions about Friday. From what I understand, if I'm trying to gather your position, is that you do not believe that mental status can transform a non-coercive question into a coercive question. I believe that's correct, Your Honor. So that's your position? Yes. Then what do we do with the statement in Conley that says, mental condition is surely relevant to an individual's susceptibility to police coercion? It goes back to the totality of the circumstances test, Your Honor. That's the best we can do. There's a large difference between that. Because if you're overcoming somebody's will, you can do it. The question may not be coercive as to one person. But given their status, it might form the basis of coercion. But that's not your position. You think that's an incorrect statement of the law. And then you take it to the secondary analysis and say, well, let's look at all the circumstances and I guess mental status can fit in somewhere. I apologize for struggling with trying to address this in 30 minutes in a sane way. The courts have struggled with defining voluntariness for a long time. Justice Crankford had a hard time describing it and described it as an amphibian. So it's not something that I'm going to be able to solve for all of you in 30 minutes. I don't think you can solve it in an hour either. That's correct, Your Honor. But that's why when I said to you I thought your answer was yes, you said it's the totality of the circumstances. And now you say it's not. It's coercive one and for all, regardless of the totality of the circumstances. I understand that it's difficult to read Supreme Court decisions and understand what they're trying to say unsuccessfully frequently. But it's our job now to try to clarify it. And here you have an unbanked court and whatever has been said before, and you say it's difficult to understand, it's our job to try to make it comprehensible. Now, therefore, shouldn't we, in trying to make this understandable, take into account the totality of the circumstances when deciding whether it's coercive? And if so, what would be coercive to a college professor might not be coercive to a college professor, might be coercive to an 8-year-old child. Isn't that a fairly obvious answer to the question? Yes, Your Honor, but they're addressing two separate issues. You give the same questions and answers to two people, a college professor and an 8-year-old child, and you say the questions are coercive or not in the abstract, regardless of the individual. Is that right? Your Honor, the concern in Connolly was to limit... Don't comment on the concern in Connolly. Tell me whether that's right or wrong. Is that your position? So, under totality of the circumstances, in determining whether someone's will is overborn or not, of course the individual makes a difference because we're looking at whether or not that person's will was overborn. Here, I think the record is clear. No matter what your view of the philosophical determination of voluntariness is, it's clear that his will was not overborn in this case. That's the difference. But... If we're making law, the answer is the same questions can be coercive and not coercive, depending on the individual who claims to be coerced. That's not what I intended to say, Your Honor. What I intended to say is the question of whether or not his will was overborn in the voluntariness determination. That's a different question. That's a question of whether these particular questions overbore the will of the defendant. Yes. But it doesn't... You don't first decide whether questions are coercive in themselves as applied to all individuals. You first decide whether they're coercive, including the nature of the individuals. And your answer is, as I understand it, yes, that is the fact. But in this case, these questions were not coercive as to the defendant. My position is, Your Honor, that in this case, the questions were not coercive as to this defendant. My position as to coercion and police coercion is that the... And Judge Kaczynski pointed this out in his concurrence in duty, I believe, that this multi-factor test relies heavily on factual determinations made by the district court. And people can look at this totality of the circumstances and come out different ways. This court, very clearly, after making very specific factual determinations, which he had, with all due respect to the appellate court, a better position to do because he was able to see the agents testify, he was able to hear the testimony of the mother and not credit her testimony to... The district court also said, because he was... I mean, he had this interesting dichotomy because you have the testimony about how you interview child victims, where the police protocols are very careful about not having leading questions, not having dichotomies, and so on. And then you have the contrary way of dealing with defendants. And he... I thought that Judge Snow said something to the effect of, well, even if it was inaccurate, it wasn't involuntary. In other words, that the same kinds of accuracy protections are not... don't make for coercion and don't make for involuntariness. And I'm not sure that's so when you're dealing with a person of this kind. Your Honor, I do believe that's so. I believe that the accuracy questions are different questions. Accuracy goes to the weight of the evidence, and a fact finder determines whether or not a confession is... But does somebody make an accurate... confess to crimes voluntarily, ordinarily? They may, Your Honor. And confessions can be false in any number of ways. We don't expect defendants who have committed crimes to tell us the truth about everything that they've done. It's up to the fact finder to determine whether or not a confession... We're very concerned about false confessions. The prosecutor's office is very concerned about false confessions. The defense is concerned about false confessions. Everyone in the process is concerned about false confessions. And there's a great deal of evidence that people of impaired cognitive ability are much more likely, for reasons like the ones we're discussing, to just ability and so on, authority figures and so on, to give false confessions. Those questions don't go to admissibility, but they go to reliability and weight. So you think they have nothing... So to go back to Judge Ronhart's question, they have nothing to do with the question of what kinds of techniques are coercive to a person of this kind. Coercive doesn't mean designed or likely to result in false information? To that I would agree, Your Honor. I would agree that you can ask... The police can't be expected to know, and they didn't know in this instance, his IQ going into the situation. Well, they could tell us somebody's four years old, right? They could tell if somebody's four years old, for example, right? Sure. So the pressing questions of a four-year-old, the same questions might be perfectly okay and non-coercive if they asked you, and coercive if they asked a four-year-old. I mean, you do agree with that, don't you? Your Honor, I don't know that I agree that it's coercive or not. I agree that they may result in unreliable testimony or unreliable statements, but I don't believe that it's coercion if the police ask a question. Well, for example, if the police sit you down and say, you know, if you don't talk to us, we'll kill your dog, right? That's coercion. Well, it might not be. You might not believe them. I would guess a canny guy like you wouldn't believe it. Or if they said, you know, we're going to capture your mother and sell her to the gypsies or something like that. You know, I don't think you'd believe that. Courts have found that threats like that are coercive. No threats like that occurred in this case. The district court found that. You know, talking over me is going to just prevent you from hearing my question. I'm sorry, Your Honor. It doesn't matter whether or not it is legally. I'm saying you might not believe. I would guess that if they told you, you know, we're going to capture your mother and sell her into slavery to the gypsies, you wouldn't believe it. You know, you would just not believe it. Whereas a four-year-old kid might actually believe it. It's the case. True or not? True. Okay. So, you don't think one question would be coercive directed to you and not, I'm sorry, coercive directed to a four-year-old child and say, look, if you don't talk to us, we're going to capture your mother and sell her to the gypsies. You don't think that would be coercive? Whereas the same question directed to you would not be? I think that the courts have found that. No, no, no, no, no. You're asking what I believe, Your Honor, now. Yeah. I mean, that's why I started out by saying do you believe? Okay. You know, if I want to say what have the courts held, I usually ask a question saying what is the authority for this, okay? And so this is English, right? Yes. Okay. That's your native tongue? Not mine, but. You're doing better than I am, Your Honor. I think so. Anyway, as prefaced with do you believe, okay? So tell me. I think it's coercive, too, either, because we don't want police asking those threatening questions to anyone, Your Honor, no matter what their IQ is. If you think it's coercive as to you, they say we are going to capture you. If you don't talk to us, we're going to capture your mother and sell her to the gypsies. You might believe that the FBI would do that. Is that necessary to assume you wouldn't? I think the question of whether or not I believe the question they're asking me is irrelevant to the question of whether or not it's coercive. I think because the courts are concerned. Well, if it had no coercion, in fact, it couldn't be coercive. Was it coercive? I mean, if coercive is an odd-off stigma, was it coercive to tell him that if he spoke to them, if he told them things that they would not go any further than the U.S. Attorney's Office and that if he said he was only doing this once, he might be able to get some help, and that if he didn't talk to them, they would come back and back and back many times, and there were other things. I mean, those sorts of things, which, again, would almost surely not be held to overbear the will of a person who didn't have his problems, but would they be? And that's why the question never gets quite decided, because it's not relevant. Are those non-coercive as opposed to coercive but not overbearing will? Your Honor, the district court may express factual findings, and my time is... That's not a factual finding. That's not a fact. It doesn't seem to me. It took one minute and 23 seconds. Right. But... Plenty of time. There were a lot of things packed into that one question, and to go through... I.e., these are kinds of questions which are either falsehoods or they are clearly designed to get someone to do something which are bases that are either not true or are likely... and or are putting him in this... I'm leaving out the binary questions, because that may be specific to this person's cognitive ability. But I'm asking for these other sets of things that are either not true or are barely covered up threats or promises. Now, they may not... Surely under the case law not coercive enough with regard to another sort of person, but are they not coercive at all? They weren't coercive to him. And the defendant knew on the confidentiality point, he was told twice that they were there to collect facts to turn them over to the U.S. Attorney's Office. And that's at page... Well, he was also told at one point that it would go in the file and it would go no further. He was told, Your Honor, that we, meaning the agents, and this is in the middle, after he was told initially that they were collecting information to turn over, and then at the end, again, before they handed over the apology note, which he knew was going to be passed along to other people, that was the entire point of doing an apology note was that it wouldn't be confidential. That's another thing. It wasn't really an apology note, and he wasn't told that it was going to be used as a confession. He was told it was going to be used as an apology note. Why would they tell him that if they weren't trying to fool him? He was told it was going to be an apology note. He knew it was going to other people. He didn't expect it to be... What was the point of putting the apology in if they weren't trying to fool him or getting him to do something he wouldn't otherwise do? Your Honor, it was permissible... That's not what I'm asking you. I'm asking you, was it designed to get him to sign something that he would not have signed if they had said this is to go to court to prove that you were guilty of what we think you're guilty of? He had already admitted to all of those facts, Your Honor. That's not what I'm asking you. I'm asking you why. I think the apology goes to his mental state. They wanted to know whether or not he was sorry. He said he was sorry. He knew what he was doing was wrong. He didn't say that until they asked him. And he said, I don't want to apologize. And he said, well, maybe I'll apologize. But agents are able to ask someone whether or not they're sorry in order to determine their mental state, Your Honor. There's nothing objectionable about telling him that it's going to be an apology note.  Well, he knew that it was going to go to somebody other than the victim? Yes. And he says at the very end, after they've gone through this exercise, at page 48, he says, and what's going to happen from here is we'll present the facts and we'll say this is what happened, and then the United States Attorney's Office will assign an attorney and they'll decide, you know, whether or not they're going to proceed or what they're going to do. And that was after or before his signing, Mr. Caput? That was after, Your Honor. Yeah, right. But that's page 48. At page 21, he said, we talked to people left and right. We don't say anything about it. We don't tell this to anybody. It stays with the folder and it stays with the U.S. Attorney's Office and that's it. So what happened Friday? And that goes to what they are going to do. It's inarticulate. I'll grant you that. It's another mistake. Tell anybody? We don't tell this to anybody, it says. Because they've already said, and he says in there, that they're going to tell it to the U.S. Attorney's Office. They're going to give it to the U.S. Attorney's Office. It's going to be in the folder. And then the U.S. Attorney's Office, he's already been told. But not all of these words. What's carefully chosen, as the agent said, open to interpretation and intended to be interpreted in a way that was helpful to getting this person to talk. Your Honor, I would submit that the one thing that we can certainly say in looking at the mistakes that were made is that not all of the words were carefully chosen by the agents in this case. They did not carefully choose their words on Friday. There's evidence in the record to suggest that they hadn't done it. But they carefully chose words like, we will put this in a file and it will go to the U.S. Attorney's Office and that's it. And if you only did this once, you probably will get some help or you possibly can get some help. Why would they say that to him if they weren't trying to induce him to choose that of the two versions? They want him to confess, Your Honor. There's no question that they want him to confess. That's why they're going there. They want him to confess to true facts. And we have a confession that led to true facts. We have DNA evidence that supports that. Well, can I ask about the DNA evidence? Yes. Maybe I'm misreading this. But as I understand the DNA argument is that he or the boy could have had the same DNA and other people couldn't? That is a misreading of the DNA evidence, Your Honor. Does the DNA evidence exclude the boy as a possibility? No, it doesn't exclude the boy as a possibility. You don't know whether the DNA was the boy's? Well, Your Honor, we have very good reason to believe that the DNA in the boy's underwear was the boy's. We have also very good reason to believe that the DNA in the boy's underwear was the defendant's. Because at five of the locations, at least five of the locations, the district court found that there were five locations where the alleles at those loci matched the defendant and didn't match anyone else who was tested. But the boy wasn't tested? The boy was tested, Your Honor. So they found that that excluded the boy? No. It was a mixture of DNA. So the mixture of DNA was of at least three people. And so those three contributors, one was the boy, one, in the opinion of the DNA expert, was the defendant, and one is an unknown. In the opinion of the expert, did he exclude the boy from that one sample? Your Honor, the swab was taken and all of the DNA is mixed together. So the DNA isn't identifiable separately. It's a DNA mixture. This is what I didn't understand. There was no semen. There wasn't test for saliva. I believe that both he and the boy said that the boy pulled down his own pants and pulled up his own pants. So what was the question? I mean, what could ñ no one ever really explained why this DNA ñ and the DNA could have been in the waistband of the underpants. So what does it prove? I mean, it proves that, yes, the two of them were together. We know they were together quite frequently. And then what else does it prove? Your Honor, we don't know ñ well, I don't believe that the boy said that he pulled down his own pants. I think it was ñ He did at least at one point. I don't know if he said something else at that point. But at least at one point he asked me to. And so you're correct. There was no semen found. But the defendant said that he wore a condom and threw that condom away. After he was ñ the idea of the condom was brought up to him because they knew that there had been a condom involved. He asked, did you wear a condom? And he nodded and said yes. And then he subsequently admitted to it and then also admitted to it in a written statement. Without the confession, was there enough there to support the conviction? That's a hard question, Your Honor. People are convicted on accusations alone in these cases. We don't always have the benefit of DNA. We don't always have the benefit of a confession. The contemporaneous ñ the excited utterances of the victim may have been enough. I don't believe we made a harmless error argument in our briefs. But that's a difficult question. And I don't know what the charging decision would have been had there not been all this other evidence as well. But the DNA evidence alone was not enough. The DNA evidence? Alone. Alone without the confession and without the ñ without an accusation. If the DNA evidence along with the contemporaneous accusation, I think it's very strong evidence. But here we have a confession that's corroborated in all of its important aspects. I don't know exactly what it's evidence of. The DNA? That he touched this kid's underpants. But the kid ñ I believe ñ I know he said at least once, maybe at some other point he said something else, that he pulled the pants down. And the defendant says that he pulled the pants ñ that the kid pulled the pants down. So I don't ñ And we also have the testimony of the grandmother who relates the excited utterance, also relates that the boy was in so much pain that he refused to sit down on the ride to the hospital, standing in the middle of the truck as they drove to the hospital because his butt hurt. That's powerful, powerful testimony. Okay. Thank you. Thank you. I think we have about a minute and a half left. We'll make it two minutes. Thank you, Chief Judge Kaczynski. Four quick points. First of all, to circle back with Judge Berzon, I think Judge Graber already helpfully answered the question. But for standard of review purposes, see, for instance, Harrison, 34S3rd at 890. Also, the government bears the burden of demonstrating voluntariness. Brown, for instance, 422 U.S. at 590. That's a different question. That's a different question. Oh, is that a different ñ I talked about the burden. It doesn't tell you whether it's a fact that's reviewed on ñ Oh, sure. Harrison for that. I was just adding on that point. And then the second ñ in the supplemental excerpts of record at 36, as was noted, after they promised the confidentiality, and that's it, we don't have to tell this to anyone, that's when he first admitted that the boy was there. But right now, whether it's for good or for ill, there's a long line of cases saying that the police do not have to tell We'll see that it goes easy for you, or maybe we'll be able to keep this just between us. We have a number of cases, as I say, for good or for ill, that don't say that those are forbidden. Do you agree with that or disagree with that? To some extent on the line, Your Honor, about the evidence, they did do that. And it can, in fact, be considered as part of the coercive mix in the totality of circumstances. But I disagree to the extent that an officer can promise them that it will go ñ that they'll take it to the prosecutor and that it'll go more lightly for them in terms of sentence or conditions of release, et cetera. Counselor, am I correct that there was nothing in the record to tell us that there was ñ that the officers knew he was cognitively impaired before they started talking to him? Oh, well, absolutely, the factors that I mentioned, Judge Christin. They knew his ñ My question is, am I right that nothing ñ Oh, I'm sorry. There's no evidence they knew he was cognitively impaired before they started interviewing him. Is that right? I don't think it's right. Oh, what did they know? If I could just clarify. What did they know? Yeah, exactly. They didn't have the medical reports. I'm not implying that. Tell us what they knew. Sure. They knew that he was 18, that he had been kicked out of high school, didn't finish. They knew that he was telling them, I'm disabled, that sometimes I go crazy. What did they know when they started talking? My question is, what did they know before they started interviewing him? Well, they also had the preliminary investigation officer, Butler, and there was an FBI agent, Fagan, who had talked with the family members, Mr. Preston's family from the victim's house. Did those family members tell the police that this person was cognitively impaired? I don't believe so. It's not on the record. It's not on the record, yes. And then the DNA evidence was mentioned. I would just point out that it's a multi-mixture sample, male and female, at least three contributors, the victim, the defendant, the other boy who was there ñ I won't mention his name ñ and the grandmother, none of whom could be excluded, and there's an unknown, at least one unknown contributor to the DNA. I just pointed out it could have been from the waistband. And then to throw on the probability statistics were incredibly problematic because the testimony from the grandmother and otherwise everyone around in this community was related. Right? So the allele frequency would be higher. It would be almost equal to saying we can become the 99.8% of people on the island of Guam didn't commit the sexual offense. That's true, but it's also irrelevant and confusing to use it in this trial. Okay. Thank you. Oh, thank you. That was fine. The case is on your list and submitted. Ron Jones. Thank you. Thank you. Thank you. Thank you.
judges: Kozinski, Reinhardt, Noonan, Thomas, Graber, Wardlaw, Gould, Paez, Berzon, Christen, Watford